**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RUSSELL BARRETT, | |
| Plaintiff, | |
| v. | No. 12 CV 6108<br>Judge James B. Zagel |
| MICRODYNAMICS CORP., d/b/a<br>MICRODYNAMICS GROUP, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Russell Barrett filed a complaint against Defendants Microdynamics Corp., doing business as Microdynamics Group ("Microdynamics"), Mangrove Benefit Services, Inc. ("Mangrove"), and Health Care Services Corporation, a Mutual Legal Reserve Company doing business as Blue Cross and Blue Shield of Illinois ("HCSC") for violations of the Consolidation Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161, promissory estoppel, and tortious interference. Defendants Microdynamics and Health Care Services Corporation settled with Plaintiffs and are dismissed from the case. Currently before the Court is Plaintiff's and Defendant Mangrove's motion for summary judgment.

**I. STATEMENT OF FACTS**

Following his termination of employment on or about May 24, 2008, Plaintiff Barrett became a participant and/or beneficiary in a COBRA continuation coverage plan, a welfare benefit plan under ERISA that continued Plaintiff's health benefits. Defendant Mangrove, doing business as BenefitOne, provided administrative and ministerial services to Strategy Execution Partners ("StratEx"), a third-party administrator for the plan sponsor, Microdynamics Corp. The Agreement entered into by Mangrove, as BenefitOne, and StratEx, required Mangrove to provide

1

"administrative and ministerial services to the Plans" and restricted Mangrove from exercising any "discretionary authority or control with respect to the Plans."

On June 16, 2008, Barrett was informed through a Continuation Fact Sheet ("Fact Sheet") that his eligible coverage period would start on June 1, 2008 and would last 18 months, and his monthly premium costs were $308.85. The Plan may establish a new premium for a policy, but it must provide the policyholder at least a thirty (30) day notice in writing, by mail or telegraph, in advance of such premium due date. Barrett's plan provided that payments made within 31 days of the due date would be considered timely made and that failure to make timely payment would result in termination of COBRA continuation coverage at the end of the period for which charges were paid. The BCBS Group Administration Document states that "if the Policyholder does not pay the premium during the grace period, the Policy will be terminated, at the Plan's option, on the last day of the grace period." Doc. 71-11, III, D, 2. Mangrove provided Barrett with coupons to assist him in making payments. These coupons were to assist in administering payments and were not used to determine actual monthly payment amounts for the COBRA plan.

Beginning in June 2008, Barrett made timely payments of $308.85 monthly for his premium and received continued coverage through COBRA. Along with each payment, Barrett attached the coupon supplied by Mangrove which stated that his premium was $308.85. During this time, Plaintiff made eleven payments to Mangrove toward his COBRA continuation coverage—seven in the amount of $308.85 for the months of June 2008 (paid on June 25, 2008), July 2008 (paid on July 9, 2008), August 2008 (paid on July 29, 2008), September 2008 (paid on August 26, 2008), October 2008 (paid on September 23, 2008), November 2008 (paid on October 28, 2008), and December 2008 (paid on November 24, 2008).

Barrett received a Change Notification, dated August 25, 2008, stating that the Carrier was changed from BCBS PPO Medical Plan to Blue Print PPO Medical. Defendants contend that the Change Notification letter also notified Barrett about the change in rates and that new coupons were sent to reflect that the premium amount due monthly retroactive from June 1, 2008 was $363.03. Def. Exhibits 3 & 4. While company records indicate a premium change, the Change Notification letter does not state a change in rates. There is also no record of the coupon books and whether Barrett was sent new coupons in the amount of $363.03 reflecting a premium change. Barrett did not submit any coupons in the amount of $363.03 to Mangrove with payment.

Mangrove, however, re-apportioned and re-applied seven previous payments of Barrett's COBRA continuation coverage in the amount of $308.85 per month towards just five monthly premiums, June 2008, July 2008, August 2008, September 2008, and October 2008, in the amount of $363.03 per month retroactive from June 1, 2008. On or after November 25, 2008, Mangrove notified Barrett by letter that his premium account was short $16.23 from a total balance of $363.03. On December 8, 2008, Barrett called the Mangrove hot line regarding this notification and told the representative that his original paperwork showed the premium due as $308.85. As directed by Mangrove, Barrett then made one payment of $16.23 on or around December 15, 2008 and three payments of $363.03 on December 24, 2008, January 27, 2009, and February 24, 2009, respectively. Barrett mailed a check to Mangrove on March 20, 2009.

On April 13, 2009, after his March 2009 check did not clear as received by Mangrove, Barrett spoke with Mangrove's agent Hilorie Knight. Plaintiff claims that he thought the March 2009 payment was to be applied towards his April premium and denies that he was told that his March 2009 premium was late. Barrett further contends that he was advised by Knight that he

3

would have to wait for a "second chance letter" regarding his payment with check #681 on March 20, 2009, which did not show as paid according to Mangrove's records, before making another premium payment. Mangrove disputes that Barrett was told to wait to make another premium payment or that Mangrove would be sending a "second chance letter" to Barrett. Barrett did not receive a second chance letter.

On April 15, 2009, Mangrove contacted Barrett to inform him that he was 46 days past due on his account. Barrett again advised Mangrove that he thought he had paid his March premium. The next day, on April 16, 2009, Mangrove notified Plaintiff that his COBRA continuation coverage was terminated as of February 28, 2009 with no opportunity to be reinstated. Plaintiff contends that he was not told that he was delinquent in paying his March premium until he had already been terminated. After receiving his termination notice, Plaintiff placed a stop payment order on the check he previously issued on March 20, 2009.

On April 17, 2009, Plaintiff's mother, Joy Barrett, contacted Mangrove to clarify why Barrett's insurance was terminated. Joy Barrett said that she and Barrett were confused about the correct amount owed for Barrett's monthly premium and asked for clarification about how payments had been applied. Joy Barrett told Eileen, the Mangrove representative, that the payment Barrett claimed he made on March 20, 2009, that Joy Barrett and Barrett believed was to be applied toward his April premium, did not clear Barrett's bank account. Barrett also explained that his premium payments were not posted properly and that his coverage should not have been terminated. Eileen informed Joy Barrett she would send Barrett a copy of his billing history to show how payments were posted.

Joy Barrett advised Eileen that she would stop payment on Barrett's March check. Joy Barrett also advised that she would fax Mangrove a carbon copy of the check Barrett tendered

4

for his March 2009 premium, his original notification letter, and a copy of the stop payment from his bank. The Mangrove representative said she would call back on Monday to advise about reinstating Barrett's coverage.

On April 18, 2009, Joy Barrett again contacted Mangrove on Barrett's behalf and the Mangrove representative reviewed Barrett's billing history to explain how his payments were applied. At Mangrove's request, Barrett's mother provided, by fax, copies of the Fact Sheet and First Payment Notice that Barrett received quoting $308.85 as the amount of the monthly premium for Plaintiff's COBRA continuation coverage and the stop payment order on the March 20, 2009 check.

On April 21, 2009, Barrett's mother again contacted Mangrove to discuss Barrett's termination, and Barrett appealed Mangrove's decision to terminate him for non-payment on or about June 25, 2009. Barrett's appeal was denied.

At all relevant times, Plaintiff has had and still has a serious illness that requires medical care which includes regular medication and treatment. Barrett was prescribed and dispensed a medication eight times between September 5, 2008 and March 18, 2009. Barrett's health plan covered each and every refill of the medication during this time. Plaintiff had a $30.00 obligation for the March 18, 2009 dispensation of the medication.

## II. DISCUSSION

**A.     Legal Standards**

   **1.     Standard of Review for Summary Judgment**

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir.2001). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir.2002).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d. 265 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003)(citing *Lujan v. Nat'l Wildfire Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000). I consider the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the non-moving party's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002).

### 2. Violation of COBRA under § 1132(a)(1) of ERISA

Section 1132(a)(1)(B) of ERISA allows a participant or beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." As the Consolidation Omnibus Budget Reconciliation Act of 1985 amended ERISA, any action for breach or wrong doing regarding COBRA should be brought pursuant to ERISA.

A denial of benefits challenged under § 1132 is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The appropriate level of judicial review for an administrator with discretionary authority is the arbitrary and capricious standard. *Mers v. Marriot Int'l Group*, 144 F.3d 1014, 1019 (7th Cir.1998).

   a.  Mangrove is a proper defendant under § 1132(a)(1)

While the statute plainly spells out who may bring a claim, it neither specifies who may be properly sued as a defendant nor limits the "universe of possible defendants" able to be sued. *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 246, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000). The Seventh Circuit has generally held that the proper defendant in a suit for benefits under an ERISA plan is normally the plan itself because the plan has the obligation to pay benefits due. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 673 (7th Cir.2011); *Jass v. Prudential Health Care Plan*, 88 F.3d 1482, 1490 (7th Cir.1996). It has, however, allowed plaintiffs in limited ERISA cases to bring an action against an ERISA plan administrator. *Riordan v. Commonwealth Edison Co.*, 128 F.3d 549, 551 (7th Cir.1997); *Mein v. Carus Corp.*, 241 F.3d 581, 584-85 (7th Cir.2001).

In *Riordan*, the plaintiff was permitted to sue the plan administrator to recover ERISA benefits because the employer failed to raise the issue in the district court and the plan documents referred to the employer and the plan interchangeably. 128 F.3d at 551. Similarly, in *Mein*, a plaintiff was allowed to sue his employer to recover ERISA benefits because the employer, acting as plan administrator, and the plan were "closely intertwined." 241 F.3d at 584-85.

7

While not binding precedent, a number of district courts have followed the Seventh Circuit's exception to the general rule and allowed claims against a party other than the ERISA plan—whether it is an employer, an insurance company, or another third-party administrator. *Friedman v. Pension Specialists, Ltd.*, 2012 WL 983784, at *3 (N.D.Ill. Mar. 19, 2012) (properly brought claim against plan sponsor that acted as a plan administrator and controlled benefit payments); *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 459 F.Supp.2d 786, 792-795 (E.D.Wis.2006). After thoroughly examining the contours of this exception, District Judge Gottschall concluded that whether a claim may be brought against a party other than the ERISA plan is largely determined by how "closely intertwined" the identity of the party is with the plan and whether the party controls eligibility for benefits and makes benefit payments. *Ayotte v. Prudential Ins., Co. of America*, 900 F.Supp.2d 814, 819 (N.D.Ill. Oct.1, 2012). Delving further, Judge Gottschall examined other circuit court decisions to find that their prevailing logic is that entities responsible for administering a plan that exercises discretion as to benefit payments are proper parties to an ERISA suit. *Id*. at 820-21.

Defendant, unlike *Riordan* and *Mein*, was not Plaintiff's employer and the Plan's policy distinguishes between the Plan, the employer, and Defendant. Defendant, however, communicated with and advised Plaintiff regarding his account, collected premiums from Plaintiff, and made payments to Plaintiff. Defendant sent Plaintiff the Change Notification letter, premium shortage letter, and kept records of communication with the Plaintiff. Defendant applied and then re-applied Plaintiff's premiums, kept records of Plaintiff's account, and decided when to terminate Plaintiff's account. Moreover, Plaintiff's account was not automatically closed after it became 31 days overdue and delinquent. Rather, Defendant used its discretion to call Plaintiff when it believed Plaintiff's account was 46 days past due and advised Plaintiff

8

regarding his account. Defendant exercised its effective control as administrator of the Plan when it ultimately decided to terminate Plaintiff's eligibility for benefits "at the Plan's option," as allowed in the BCBS Group Administration Document. For these reasons, even though the Agreement between Mangrove and StratEx specifically stated that Mangrove is not the Plan Administrator, Mangrove acted as such and was effectively the administrator of the plan. I thus find that Mangrove is a proper party under § 1132.

    b.  Termination of Plaintiff's COBRA Continuation Coverage

Under § 1132(a)(1)(B), Plaintiff is entitled to recover from Defendant's benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. Defendant contends that Plaintiff is not "due" any benefits and has no rights under the plan because the COBRA continuation coverage was terminated for cause. Defendant argues that Plaintiff failed to pay his premium on time as required and was, consequently, terminated from the plan. Plaintiff asserts that because he was not provided requisite notice of a premium increase from Defendant, as required by the policy, he was not required to pay the increased premium, retroactive to June 2008, and not delinquent.

While Plaintiff received a Change Notification on or around August 25, 2008 stating that the Carrier was changed from BCBS PPO Medical Plan to Blue Print PPO Medical, the document is silent as to any change in premium and did not include any accompanying policy documents reflecting the plan change. Defendant asserts that Plaintiff was notified of the premium change and given new coupon books reflecting the increase; there is, however, no record of the coupon books. Irrespective, as the coupon books were used solely to administer payments and not to determine the actual monthly payment amounts due, it is unclear that newly

9

printed coupon books would satisfy the requirement under the Plan to provide written notice of a premium change.

Rather, Plaintiff made timely monthly payments of $308.85 from June 2008 through December 2008, generally paying a month's premium payment before the start of the month. On or after November 25, 2008, Plaintiff received a letter from Defendant that his premium account was short $16.23 from a starting amount due of $363.03. Plaintiff called Defendant regarding this letter and notified the representative that his original paperwork showed the premium due as $308.85. Pursuant to this conversation and as directed by Mangrove, Plaintiff made payment of $16.23 on December 15, 2008 and three payments of $363.03 on December 24, 2008, January 27, 2009, and February 24, 2009.

Plaintiff made these payments at the direction of Defendant but had not been notified of the change in premium. Plaintiff was also not advised that Defendant had applied a premium change to all paid premiums, retroactive to June 2008. As a consequence of Defendant's re-appropriation of premium payments made by Plaintiff since June 2008, Defendant's payment of seven months premium was reapplied to only five monthly premiums. Plaintiff was neither notified of the premium change nor the reapplication of his prior premium payments. Consequently, Defendant's actions placed an unknowing Plaintiff more than a full month behind his premium payment. When Plaintiff sent a check on March 20, 2009, he sought to pay his premium in advance for April 2009, not his March 2009 monthly premium.

On April 15, 2009, at the time Plaintiff learned that his account was 46 days past due, and on April 16, 2009, when Plaintiff was notified that his COBRA continuation coverage was terminated, Plaintiff had weeks left to pay his April 2009 premium before becoming delinquent. It wasn't until April 18, 2009, after Plaintiff's coverage was terminated, that Plaintiff became

aware of how his premium payments had been applied, retroactive to June 2008, due to the premium increase. Plaintiff did not receive appropriate notice of a change in his premium such that late payment for his March 2009 premium was not grounds for termination for cause, but due to the Defendant's failure to provide requisite notice, pursuant to its Agreement.

Plaintiff argues that Defendant was a fiduciary that breached its fiduciary duty by failing to provide Plaintiff notice of a change in the monthly premium rate.[1] A person acting as a fiduciary need not be named as a fiduciary by the benefit plan as long as they exercise discretionary control or authority over the plan's management, administration, or assets. 29 U.S.C. § 1102; *Leigh v. Engle*, 727 F.2d 113, 134 n. 33 (7th Cir. 1984) (a person can become a fiduciary with respect to a particular activity even if there is no formal written allocation of the duty). Furthermore, a fiduciary need not exercise *entirely* discretionary authority or control as long as he exercises *any* discretionary control. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 956 (1989). I conclude that Defendant certainly functioned as a fiduciary to Plaintiff for the purpose of administering Plaintiff's COBRA account, without deciding whether Defendant was a fiduciary or not—which I believe the facts suggest could turn either way. I am not completely satisfied with the record of undisputed facts as it currently stands as to Defendant's role. As the question remains whether Defendant was a fiduciary, I deny summary judgment.

### 3. Equitable Estoppel

Plaintiff seeks summary judgment in his favor on an equitable estoppel claim. Estoppel arises when one party has made (1) a misleading representation, (2) in writing, to another party

---

[1] While Plaintiff alleged facts to support a claim for breach of fiduciary duty and, arguably, provided *de facto* notice to Defendant, Plaintiff failed to allege a breach of fiduciary duty in his Second Amended Complaint. While the Plaintiff may have learned additional facts to support new legal claims post-discovery, the Court can only adjudicate those allegations made in Plaintiff's Complaint.

11

and the other has (3) reasonably relied on that representation to his (4) detriment. *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849 (7th Cir.1997). The relying party must establish that the party making the misrepresentation made it knowingly. *Brosted v. Unum Life Ins. Co. of America*, 421 F.3d 459 (7th Cir.2005).

Plaintiff claims that on June 16, 2008 he received a Continuation Fact Sheet, prepared and sent by Defendant, stating the terms of the policy and a monthly premium rate of $308.85. Plaintiff further argues that he relied on the Fact Sheet, continued paying a monthly rate of $308.85 until he was terminated for untimely payments due to an account shortage, and lost his continuing coverage under COBRA. While Plaintiff certainly relied on the Fact Sheet to what appears to be a great detriment, there is nothing to support a conclusion that the Fact Sheet was a misleading representation. The Fact Sheet was accurate on the date it was provided to Plaintiff and contained the correct premium amount. There is no indication on the Fact Sheet that there could be no premium changes in the future. Defendant's failure to provide adequate notice to Plaintiff at a later time does not turn the Fact Sheet into a misleading misrepresentation at the time it was created and sent to Plaintiff. Plaintiff cannot prevail on his claim for equitable estoppel.

**4.    State law claims for promissory estoppel and tortious interference**

In the alternative, Plaintiff seeks summary judgment due to an alleged violation by Mangrove under state-law claims for tortious interference and promissory estoppel. Both Plaintiff's tortious interference and promissory estoppel claims arise from the alleged promise made by Defendant's agent, Hilorie Knight, to wait for Defendant to send Plaintiff a "second chance" letter in response to an issue with his March 2009 payment.

The Supreme Court stated in *Aetna Health Inc. v. Davila*, that a state-law claim is deemed to be a preempted federal claim under ERISA Section 502(a)(1) if (1) the plaintiff complains about being denied benefits to which he is entitled only because of the terms of an ERISA-regulated plan; and (2) the plaintiff does not allege the violation of any state or federal legal duty independent of ERISA or the plan. 542 U.S. 200, 211; 124 S.Ct. 2488, 2497 (2004)).

The Seventh Circuit has expressly stated, "[t]he availability of a federal remedy is not a prerequisite for federal preemption." *Lister v. Stark,* 890 F.2d 941, 946 (1989). While Plaintiffs cannot opt out of ERISA to pursue other state law claims related to an employee benefit plan or plead alternative claims in the event their ERISA claims fail, if "the connection between a state law claim and the benefit plan is too tenuous, remote, or peripheral, ERISA's preemption provision may not apply." *Sharp Elecs. Corp. v. Metro. Life Ins. Co.,* 578 F.3d 505, 514 (7th Cir.2009).

          i.    Tortious Interference

Defendant argues that Plaintiff's claim for tortious interference is preempted by ERISA. Plaintiff alleges that Plaintiff had a valid and enforceable contract, the COBRA plan, with Defendant, of which Defendant's agent Knight was aware. Plaintiff further contends that Defendant's agent intentionally and unjustifiably induced Plaintiff to breach his contract by telling him to wait to make an additional payment until he received a "second chance" letter.

A state law claim for tortious interference that materially affects the administration of the ERISA plan and is not protected by ERISA's saving clause is preempted by ERISA. *Health Cost Controls v. Manetas*, 1995 WL 66383, *4 (N.D.Ill. Feb 13, 1995) (tortious interference claim based upon an agreement for reimbursement of ERISA plan payments materially affects administration of ERISA and is preempted). Plaintiff's claim against Defendant for tortious

13

interference based upon representations of Defendant's hotline representative could likely alter administration of the plan. Regardless, at the core, Plaintiff's claim is that he was denied benefits to which he was entitled under the Plan because Defendant interfered with his contract. Although the crux of this claim—that Plaintiff's reliance on Defendant's communication caused him to breach his contract—is based on representations made by Defendant and not on the Plan itself, it does require analysis of the Plan and a finding of a breach of the Plan resulting in a deprivation of benefits. Consequently, Plaintiff's claim for tortious interference fails the first prong of the *Davila* test and is preempted.

    ii. Promissory Estoppel

 While the Seventh Circuit has allowed a claim for promissory estoppel not within the scope of ERISA to stand, the present case can easily be distinguished. In *Franciscan Skemp Healthcare, Inc. v. Central States Joint Bd. Health and Welfare Trust Fund*, 538 F.3d 594 (7th Cir.2008), the plaintiff was a healthcare provider and assignee to a beneficiary, but brought a promissory estoppel claim entirely in its own right, independent from and arising from duties imposed apart from ERISA and any plan terms.

 Plaintiff's promissory estoppel claim is more akin to *Pohl v. National Benefits Consultants, Inc.*. 956 F.2d 126 (7th Cir. 1992). In *Pohl*, the plaintiff's claim for negligent misrepresentation was based on an alleged oral modification of the plan itself. *Id*. at 128. There, modifications were covered under the ERISA plan documents. Similarly, Plaintiff's claim for promissory estoppel is based on the alleged promise made by Defendant's agent, Hilorie Knight, to Plaintiff that he should wait to make further payment to remedy the defective March 2009 payment until he received a "second chance" letter from Defendant. The representation or

Case: 1:12-cv-06108 Document #: 93 Filed: 01/16/14 Page 15 of 17 PageID #:834

"promise" Knight allegedly made to Defendant is regarding payment owed under the Plan, which is covered in documents relating to the Plan, and preempted under the first prong of *Davila*.

If by some chance we are mistaken and Plaintiff's promissory estoppel claim is based on Defendant's conduct that is independent of the Plan, it could not have been brought under ERISA and survives the first prong of the *Davila* test. In that case, Plaintiff is not suing under this claim to recover benefits due under the plan, but to seek damages arising from the alleged promise made by Defendant's agent, Hilorie Knight, to Plaintiff that he should wait to make further payment to remedy the defective March 2009 payment until he received a "second chance" letter from Defendant—a wrong that is not within the scope of ERISA. *Franciscan Skemp Healthcare* (plaintiff who brought independent claims, not just claims to "enforce rights under the terms of the plan" as an assignee, was not preempted). Unlike in *Pohl*, where plaintiff's claim for negligent misrepresentation was based on an alleged oral modification of the Plan itself that was expressly disallowed under ERISA, Plaintiff's claim for promissory estoppel is not related to the Plan itself, but relating to remedying an administrative issue regarding payment. *Pohl,* 956 F.2d at 128.

Turning to the second prong under *Davila,* Plaintiff's promissory estoppel claim derives from duties, imposed apart from ERISA and/or the plan terms, of good faith and fair dealing. *Alabama v. North Carolina*, 560 U.S. 330, 130 S.Ct. 2295 (2010) ("[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement"). Under Illinois state law, the Statute of Frauds ordinarily applies to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel. *Fischer v. First Chicago Capital Mkts., Inc.,* 195 F.3d 279, 284 (7th Cir. 1999) (citing *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.,* 58 F.3d 1227, 1231 (7th Cir.1995)). However, there are several

15

exceptions to the writing requirement, including partial performance or uncertainty of duration. This Court must find clear and unambiguous terms, that the partial performance by the party seeking to enforce the contract, and that the acts alleged as partial performance were attributable exclusively to the contract. *Leekha v. Wentcher*, 166 Ill.Dec. 599, 604, 586 N.E.2d 557, 562 (1991) (citations omitted).

Plaintiff alleges that Defendant told Plaintiff to wait to submit further payment until he received a "second chance letter." Plaintiff further contends that he relied on Defendant's promise to send a "second chance" letter and waited to make further payment solely based on Defendant's promise. Plaintiff has alleged partial performance of a contract based on Defendant's promise; the relevant legal duties owed on this contract are entirely independent from ERISA and any plan terms. Therefore, under both *Davila* prongs, Plaintiff's state-law claim for promissory estoppel survives preemption.

### 5. Promissory Estoppel

Plaintiff seeks summary judgment against Defendant on his promissory estoppel claim. To establish a claim for promissory estoppel, Plaintiff must prove that: (1) Defendant made an unambiguous promise to Plaintiff; (2) Plaintiff relied on such promise; (3) Plaintiff's reliance was expected and foreseeable by Defendant; and (4) Plaintiff relied on the promise to his detriment. *Newton Tractor Sales, Inc v. Kubota Tractor Corp.*, 233 Ill.2d 46, 51, 906 N.E.2d 520, 524 (2009). Further, as previously stated, under Illinois law, the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel. *Fischer*, 195 F.3d at 284; *Trustmark Ins. Co. v. General Cologne Life Re of America*, 424 F.3d 542 (7th Cir. 2005).

As a threshold matter, there remains a question regarding whether Defendant made an unambiguous promise to Plaintiff. Plaintiff claims that he called Defendant to get clarification about his account and issues he had with his recent payments. During this call, Plaintiff explained to Defendant's agent, Hilorie Knight, that he had sent in a check in March 2009 that did not get processed as received by Defendant. In response, Plaintiff contends that Knight told Plaintiff to "wait for a second chance letter." Although Defendant denies this, the record plainly shows that a second chance letter was discussed and recorded in Defendant's files. However, what statements were made during this conversation and whether a promise was made is a material fact in dispute. Consequently, Plaintiff's motion for summary judgment on a promissory estoppel claim is denied.

### III. CONCLUSION

For the foregoing reasons, summary judgment is denied in its entirety with respect to Plaintiff and Defendant.

                                             ENTER:

                                             James B. Zagel
                                           United States District Judge

DATE: January 16, 2014